**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| STEPHANIE TURNER, | ) | CASE NO. 5:14-CV-01761 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | VECCHIARELLI |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | | |

Plaintiff, Stephanie Turner ("Plaintiff"), challenges the final decision of Defendant,

Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying

her applications for Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and

Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42

U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This case is before the undersigned United

States Magistrate Judge pursuant to the consent of the parties entered under the authority

of 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final

decision is REVERSED and REMANDED for proceedings consistent with this

Memorandum Opinion and Order.

## I.    PROCEDURAL HISTORY

On June 1, 2012, Plaintiff filed her applications for POD, DIB, and SSI, alleging a

disability onset date of March 31, 2012.  (Transcript ("Tr.") 16.)  The claims were denied

initially and upon reconsideration, and Plaintiff requested a hearing before an

administrative law judge ("ALJ").  (*Id.*)  On October 23, 2013, an ALJ held Plaintiff's

hearing.  (*Id.*)  Plaintiff participated at the hearing and testified.  (*Id.*)  A vocational expert

("VE") also participated and testified.  (*Id.*)  Bonnie Donahue, a non-attorney representative, represented Plaintiff.  (*Id.*)  On April 23, 2013, the ALJ found Plaintiff not disabled.  (Tr. 1.)  On June 17, 2014, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision.  (Tr. 1.)

On August 12, 2014, Plaintiff filed her complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 14, 16.)

Plaintiff asserts the following assignments of error: (1) The ALJ erred in evaluating the opinions of two of Plaintiff's treating physicians; and (2) the ALJ erred in posing an incomplete hypothetical to the VE.

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Plaintiff was born in March 1957 and was 56-years-old at the time of her administrative hearing.  (Tr. 35, 111.)  She was a high school graduate and attended two years of college.  (Tr. 35, 295.)  She had past relevant work as an inventory clerk, a production planner, a service manager, and a buyer.  (Tr. 55.)

### B.  Medical Evidence

#### 1.  Medical Reports

On March 21, 2012, Lokesh Ningegowda, M.D., evaluated Plaintiff at the Cleveland Clinic's Chronic Pain Clinic.  (Tr. 444-448.)  A physical examination was positive for back pain, muscular weakness, and diffuse multiple tender points over the bilateral cervical paraspinal muscles and bilateral lumbar paraspinal muscles.  (Tr. 447.)  Dr. Ningegowda described Plaintiff as appearing alert and in no acute distress.  (*Id.*)  A neurological exam

2

revealed that Plaintiff was grossly intact neurologically with normal motor strength and a normal gait.  (Tr. 448.)

On March 23, 2012, Plaintiff saw Robert Bales, M.D., with complaints of a lump in her throat.  (Tr. 433.)  Dr. Bales noted that Plaintiff had "multiple underlying medical problems who she's been seeing a[n] outside family physician for" and that Plaintiff was "out on disability" due to her condition.  (*Id.*)  Dr. Bales' examination revealed back pain. (Tr. 434.)  Dr. Bales recommended regular aerobic exercise and referred Plaintiff for a TENS unit which she obtained the same day.  (Tr. 441.)

On April 13, 2012, Plaintiff told Dr. Bales that the TENS unit was providing her with good pain control and that she would occasionally use Vicodin for breakthrough pain.  (Tr. 428.)  On May 9, 2012, Plaintiff told Dr. Bales that she felt she was over-medicating herself.  (Tr. 422.)  She complained of neck pain that radiated from her right arm to her chest.  (*Id.*)  Dr. Bales described Plaintiff as well-developed, well-nourished, and in no distress.  (*Id.*)

On May 9, 2012, a magnetic resonance imaging (MRI) scan of Plaintiff's cervical spine revealed a spinal cord of normal morphology and signal characteristics.  (Tr. 426.) Andrew Tievsky, M.D., also reported that a normal bone marrow signal was present at all levels and that the vertebral heights were well-maintained at all levels.  (*Id.*)  Dr. Tievsky reported an impression of spondylotic changes.  (*Id.*)

On May 24, 2012, Plaintiff saw Dr. Bales for neck and back pain with the neck pain causing numbness and tingling in the arms.  (Tr. 412.)  On examination, Plaintiff was well-developed, well-nourished, and in no distress.  (Tr. 414.)  Dr. Bales' impression was neuralgia, neuritis, radiculitis, and polyneuritis.  (*Id.*)  A bone densitometry revealed

3

osteopenia.  (Tr. 419.)  Naveen Subhas, M.D., set out bone density study recommendations that included weight bearing exercises and strength training as well as smoking cessation for Plaintiff.  (Tr. 420.)

On June 20, 2012, Plaintiff saw Russell C. DeMicco, M.D., at the Cleveland Clinic Center for Spinal Health on a referral from Dr. Bales.  (Tr. 404.)  Plaintiff reported experiencing excruciating pain when sitting for 30 minutes.  (*Id.*)  She also reported pain in her bilateral low back and pain in her neck into her posterolateral upper limb down to the pinky and ring fingers.  (*Id.*)  Plaintiff denied bowel or bladder control issues.  (*Id.*)  Dr. DeMicco described Plaintiff as well appearing, somewhat anxious, and in no acute distress.  (Tr. 406.)  On neurological examination, Plaintiff had normal motor strength in her upper and lower extremities, negative results on straight leg raising tests, and a normal gait.  (*Id.*)  Dr. DeMicco diagnosed lumbar radiculitis; acquired spondylolisthesis; degeneration of lumbar or lumbosacral intervertebral disc disease; myalgia and myositis; cervical spondylosis; and degeneration of a cervical intervertebral disc.  (*Id.*)

A June 2012 x-ray of Plaintiff's nasopharanx revealed moderate mid-level cervical spondylosis and osteophytosis according to Cecelia Holden, M.D.  (Tr. 402.)  The study also revealed moderate disc space narrowing at C4-5, C5-6, and C7.  (*Id.*)  Dr. Holden commented that anterior osteophytosis at these levels was usually consistent with diffuse idiopathic skeletal hyperostosis.  (*Id.*)  Otherwise, the study revealed no pre-vertebral swelling, no airway obstruction, and no radiopaque foreign material.  (*Id.*)  A chest x-ray taken on the same day revealed no acute process.  (*Id.*)

Dr. Bales saw Plaintiff on June 22, 2012, and noted that she achieved decent pain control with Percocet, but that she still struggled with pain at night.  (Tr. 397.)  Physical

4

examination showed chest and back pain.  (Tr. 398.)  Dr. Bales described Plaintiff as well-developed, well-nourished, and in no distress.  (Tr. 399.)

A lumbar MRI was obtained on July 3, 2012.  (Tr. 411-412.)  This study revealed moderate degenerative changes throughout the lumbar spine, most significantly at the L4-5 disc space and in the right L4-5 and L5-S1 facet joints.  (Tr. 412.)  On July 6, 2012, Plaintiff saw Dr. DeMicco with complaints of pain in the low back and into the bilateral lower limbs when sitting.  (Tr. 466.)  Plaintiff received an L4-5 interlaminar epidural steroid injection on July 13, 2012.  (Tr. 455, 464.)  Dr. DeMicco's assessment after the procedure was lumbar radiculitis, degenerative disc disease, lumbar stenosis, lumbosacral spondylosis, low back pain, and acquired spondylolisthesis.  (Tr. 464.)

On July 26, 2012, Plaintiff reported some improvement after the injection, telling Dr. Bales that she could sit for 60 minutes and had reduced pain.  (Tr. 392.)  At that time, Plaintiff's active problem list included cervical disc disorder, neck pain, carpal tunnel syndrome, tardy ulnar nerve palsy, lumbar radiculitis, spondylolisthesis, lumbar and cervical degenerative disc disease, lumbar and cervical spondylosis, lumbar stenosis, and depression.  (*Id.*)

On July 27, 2012, Plaintiff reported to Dr. DeMicco that she noticed a reduction in her pain after the injection.  (Tr. 455.)  She was able to sit for an hour and was tolerating other activities better as well, but her symptoms were still present.  (*Id.*)  Dr. DeMicco performed another injection on July 31, 2012.  (Tr. 459-460.)

A CT scan of Plaintiff's lumbar spine from October 23, 2012, revealed lumbar degenerative changes notable for moderate canal stenosis at L4-5 with severe bilateral foraminal stenosis, mild to moderate canal stenosis at L3-4, as well as additional

5

degenerative changes.  (Tr. 658.)  Four x-rays of Plaintiff's lumbar spine, taken in November 2012, revealed sponylolisthesis at L4-5, which was accentuated on flexion.  (Tr. 471.)  This resulted in encroachment on Plaintiff's spinal cord at L4-5.  (*Id.*)  An electromyographic (EMG) study from November 21, 2012, produced results consistent with carpal tunnel syndrome in Plaintiff's right wrist, with no comparable findings in her left wrist.  (Tr. 473.)  On December 12, 2012, an EMG study of Plaintiff's right leg produced essentially normal results with no definite evidence of lumbosacral motor radiculopathy. (Tr. 651.)

On December 24, 2012, Plaintiff saw Ursula Szmulowicz, M.D., for complaints of diarrhea and urinary incontinence.  (Tr. 555-557.)

On January 29, 2013, Plaintiff saw Jahangir Malecki, M.D., Ph.D., at the Cleveland Clinic's Neurological Pain Center.  (Tr. 481-485.)  Dr. Malecki reviewed Plaintiff's history and noted that over the past six months, Plaintiff had developed bowel and bladder incontinence and progressively worsening pain.  (Tr. 482.)  Dr. Malecki noted that Plaintiff had changed her work to part-time in 2010 and had recently applied for disability.  (*Id.*)  Dr. Malecki was trying to determine whether Plaintiff could qualify for a program at the Cleveland Clinic.  (Tr. 485.)  To that end, he ordered a CT scan of Plaintiff's head to rule out normal pressure hydrocephalus (NPH) and an MRI of her cervical spine to have her spinal cord pressure re-assessed.  (*Id.*)  Dr. Malecki indicated that Plaintiff could join the program if the tests produced negative results.  (*Id.*)  Dr. Malecki opined that Plaintiff's prognosis was good.  (*Id.*)

On February 13, 2013, Dr. Malecki reported that Plaintiff had undergone the CT scan of her head and the MRI of her cervical spine.  (Tr. 481.)  Because the test results

6

were negative, in that they showed no hydrocephalus and no critical cervical stenosis, Plaintiff could enroll in the Cleveland Clinic's program.  (*Id.*)

Plaintiff began physical therapy on February 26, 2013.  (Tr. 492.)  Her therapy goals were to be able to play with her grandchildren, play golf, do household chores with improved ease, do yard work, improve her ability to get up an down from the floor, and to enjoy cooking.  (Tr. 493.)  The diagnosis for treatment was chronic back, neck, and upper extremity pain.  (Tr. 497.)  Plaintiff reported that she had difficulty standing at the stove and putting food in and out of the oven; she had difficulty pushing a grocery cart and unloading groceries; she needed assistance carrying a laundry basket up and down steps; and she had difficulty vacuuming, doing dishes, making a bed, driving, and doing yard work.  (Tr. 502-503.)  Plaintiff's sitting and standing tolerance was 10 minutes.  (Tr 504.)  Plaintiff demonstrated the ability to lift 15 pounds from the floor to her waist and carry 15 pounds for 20 feet.  (Tr. 505.)  The evaluator noted that these abilities placed Plaintiff in the sedentary-to-light demand level.  (*Id.*)  The goal was for Plaintiff to comfortably lift up to 25 pounds and carry 25 pounds.  (Tr. 506.)

On April 11, 2013, a polysomnogram revealed that Plaintiff had severe obstructive sleep apnea.  (Tr. 529.)  Carlos Rodriguez, M.D., prescribed a CPAP titration and advised Plaintiff not to drive when sleepy.  (Tr. 575.)

On May 14, 2013, Plaintiff returned to Dr. DeMicco for an epidural steroid injection. (Tr. 591.)  Plaintiff returned to Dr. DeMicco on July 3, 2013, and reported that she had "excellent total relief of her typical painful symptoms from the low back radiating down the lower limbs for 4-6 weeks," but that the symptoms seemed to be returning to a bothersome level.  (Tr. 621.)  Dr. DeMicco planned a repeat injection in two-to-three

7

weeks.  (Tr. 622.)  Dr. DeMicco administered a bilateral L5 transforaminal epidural steroid injection on July 23, 2013.  (Tr. 626-627.)

On July 29, 2013, Plaintiff saw Hugo L. Paz Y Mar, M.D., for follow-up with her sleep problems.  (Tr. 561.)  She reported substantial improvement of her symptoms, noting that she was sleeping better with less waking up.  (*Id.*)  While Dr. Paz Y Mar noted that Plaintiff still had some sleep problems, he observed that in general, she felt better.  (*Id.*)

On August 30, 2013, Plaintiff saw Dr. Bales for complaints of depression.  (Tr. 632.)  Dr. Bales noted that Plaintiff felt worse on Cymbalta and did not want to leave her house.  (*Id.*)

On September 19, 2013, Dr. Bales completed a "Fatigue Questionnaire" on behalf of Plaintiff.  (Tr. 643.)  Dr. Bales reported that plaintiff had moderate[1] fatigue that frequently interfered with her ability to maintain attention and concentration to sufficiently complete tasks in a timely manner.  (*Id.*)  He noted that Plaintiff's stress contributed to her fatigue and that her fatigue interfered with her ability to deal with stress.  (*Id.*)  Dr. Bales opined that, on average, Plaintiff's impairment or treatment would cause her to be absent from work more than two days a month.  (*Id.*)

Dr. Bales also completed a physical residual functional capacity (RFC) assessment.  (Tr. 644-645.)  Dr. Bales opined that Plaintiff was limited to sitting up to two hours in an eight-hour workday and standing and walking for four hours in an eight-hour workday.  (Tr. 644.)  Dr. Bales further opined that in an eight-hour workday, Plaintiff could occasionally lift up to 20 pounds and was restricted with regard to reaching, handling,

---

[1]  "Moderate" was defined on the form as "[a]n impairment which affects but does not preclude ability to function."  (Tr. 653.)

8

pushing, and pulling.  (Tr. 644-645.)

Dr. DeMicco completed a questionnaire on September 25, 2013, titled "Disorders of the Spine- 1.04A."  (Tr. 646.)  Dr. DeMicco reported that Plaintiff experienced numbness, pain in the low back and into both legs, neck pain, and numbness in the left knee area.  (Tr. 646-647.)  He also noted that Plaintiff's fibromyalgia and depression contributed to the severity of her impairment and that she could do well with pain control for many weeks, but would then have a flare-up and need time off from work.  (Tr. 649.)

Dr. DeMicco also completed a pain questionnaire wherein he explained that Plaintiff had pain that varied from moderate to severe and which interfered with Plaintiff's ability to maintain attention and concentration to sufficiently complete tasks in a timely manner on a variable basis ranging from occasional to constant.  (Tr. 650.)

### 2.    Agency Reports

On October 8, 2012, Rebecca Neiger, M.D, a state agency physician, reviewed the record and determined that Plaintiff was capable of performing light work.  (Tr. 81-82.)

On December 21, 2012, state agency physician Gerald Klyop, M.D., opined that Plaintiff was limited to light work.  (Tr. 107-109.)

### C.    Hearing Testimony

### 1.    Plaintiff's Hearing Testimony

Plaintiff testified that she had fibromyalgia, degenerative disc disease, arthritis in her neck, two herniated discs in her back, spinal stenosis, scoliosis, carpal tunnel, pain in her lungs, myalgia and myositis, cervical spondylosis, lumbar stenosis, low back pain, sleep apnea, irritable bowel syndrome, and depression.  (Tr. 36-37.)  Plaintiff stated that the condition that bothered her most was degenerative disc disease of her lower back.

9

(Tr. 39.)  She also stated that she experienced bowel incontinence due to her spine.  (*Id.*)
Plaintiff testified that she could sit for 15 or 20 minutes before she would need to change
positions, and she could stand for about 15 minutes before feeling a burning sensation in
her legs, neck, and back.   (Tr. 50.)  Plaintiff testified that she had difficulty keeping her
balance.  (Tr. 51.)  She stated that she could lift and carry a maximum of about five or 10
pounds.  (*Id.*)

      **2.**    **Vocational Expert's Hearing Testimony**

     Bruce Walmer, a vocational expert, testified at Plaintiff's hearing.  The ALJ asked
the VE to consider a hypothetical individual of Plaintiff's age, education, and work
experience.  (Tr. 56.) The individual could: lift 20 pounds occasionally and 10 pounds
frequently; stand/walk six hours in an eight-hour workday; sit six hours in an eight-hour
workday; occasionally push/pull and use a foot pedal; occasionally use a ramp or stairs
but never a ladder, rope, or scaffolds; frequently balance; occasionally stoop; never kneel;
occasionally crouch; and never crawl.  (*Id.*)  The individual would have frequent, as
opposed to constant, manipulative capabilities and frequent visual capabilities.  (*Id.*)  The
individual's communication skills would be constant.  (*Id.*)  The individual should avoid high
concentrations of extreme cold and dangerous machinery and unprotected heights.  (*Id.*)
The individual would be limited to low stress work that did not involve production quotas or
piece rate work.  (*Id.*)  The individual would be precluded from work involving arbitration,
confrontation, negotiation, or supervision.  (*Id.*)  The VE testified that the hypothetical
individual would be capable of performing Plaintiff's past work as an inventory clerk and a
production planner.  (Tr. 57.)  The VE further testified that the hypothetical individual would
be capable of performing such jobs as a small parts assembler, a mail clerk, and an

10

assembly machine tender.  (*Id.*)

### III.   STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs., 667 F.2d 524 (6th Cir. 1981)*.  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan, 905 F.2d 918, 923 (6th Cir. 1990)*.  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot, 905 F.2d at 923*.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's

impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2016.

2. Plaintiff has not engaged in substantial gainful activity since March 31, 2012, the alleged onset date.

3. Plaintiff has the following severe impairments: disorders of the back–degenerative and discogenic, fibromyalgia, irritable bowel syndrome, osteoarthritis, bilateral carpal tunnel syndrome S/P release, and depression.

4. Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, I find that Plaintiff has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), with lifting or carrying 20 pounds occasionally, 10 pounds frequently; with the ability to stand or walk 6 hours in an 8-hour work day; with the ability to sit about 6 hours in an 8-hour work day; with the ability to occasionally push/pull and use foot pedals; with the ability to occasionally climb ramps and stairs; precluded from climbing ladders, ropes, and scaffolds; with the ability to frequently balance; with the ability to occasionally stoop; precluded from kneeling; with the ability to occasionally crouch; precluded from crawling; with frequent manipulative and visual capabilities; with the ability to engage in constant communication skills; must avoid high concentration of extreme cold, dangerous machinery, and unprotected heights; limited to low stress work; precluded from high production quotas or piece rate work; and precluded from work involving arbitration, confrontation, negotiation, or supervision.

6. Plaintiff is capable of performing past relevant work as an inventory clerk and production planner.  This work does not require the performance of work-related activities precluded by Plaintiff's residual

12

functional capacity.

7.    Plaintiff has not been under a disability, as defined in the Social Security
Act, from March 31, 2012, through the date of this decision.

(Tr. 18-25.)

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether
the Commissioner's decision is supported by substantial evidence and was made
pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th
Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc.
Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the
record to determine if the ALJ's decision is supported by substantial evidence, regardless
of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review
the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v.
Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the
ALJ failed to apply the correct legal standards or made findings of fact unsupported by
substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th
Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a
preponderance and is such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by
substantial evidence will not be overturned even though substantial evidence supports the
opposite conclusion.  *Ealy*, 594 F.3d at 512.

13

**B.      Plaintiff's Assignments of Error**

**1.      The ALJ Erred in Evaluating the Opinions of Two of Plaintiff's Treating Physicians.**

Plaintiff argues that the ALJ violated the treating physician rule with respect to Drs. Bales and DeMicco.  "An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).  This "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is to "let claimants understand the disposition of their cases" and to allow for "meaningful review" of the ALJ's decision, *Wilson*, 378 F.3d at 544 (internal quotation marks omitted).  Where an ALJ fails to explain his reasons for assigning a treating physician's opinion less than controlling weight, the error is not harmless and the appropriate remedy is remand.  *Id.*

**Dr. Bales**

On September 19, 2013, Dr. Bales completed a fatigue questionnaire and an RFC assessment. (Tr. 643-645.)  Dr. Bales reported that Plaintiff had moderate fatigue that frequently interfered with her ability to maintain attention and concentration to sufficiently

14

complete tasks in a timely manner.  (Tr. 643.)  He noted that Plaintiff's stress contributed to her fatigue and that her fatigue interfered with her ability to deal with work stresses.  (*Id.*)  In assessing Plaintiff's RFC, Dr. Bales opined that Plaintiff was limited to sitting for up to two hours in an eight-hour day; standing and/or walking for up to four hours in an eight-hour day; and occasionally lifting up to 20 pounds.  (Tr. 644.)  Dr. Bales further opined that Plaintiff was restricted in her ability to reach, handle, push, and pull.  (Tr. 645.)  The ALJ gave no weight to Dr. Bales' September 2013 opinion, noting that "the medical evidence of record does not support a finding that [Plaintiff] could only sit up to 2 hours and stand or walk 4 hours in an 8-hour workday."  (Tr. 23.)  Plaintiff maintains that the ALJ erred by failing to give "good reasons" for assigning less than controlling weight to Dr. Bales' opinion.  The Court agrees.

While the ALJ clearly rejected Dr. Bales' opinion regarding Plaintiff's fatigue and physical limitations, he failed to adequately explain his reasons for doing so.  The ALJ stated that he assigned no weight to Dr. Bales' assessment at Exhibit 11F, which includes the fatigue questionnaire and the physical RFC assessment (hereafter referred to as the "opinion"), because "the medical evidence does not support a finding that [Plaintiff] could only sit up to 2 hours and stand or walk 4 hours in an 8-hour workday."  (Tr. 23.)  This statement does not amount to giving "good reasons" for rejecting the opinion of Dr. Bales, a treating source.  *See Wilson,* 378 F.3d at 545 (finding that the ALJ's "summary dismissal" of the opinion of the claimant's treating physician failed to satisfy the "good reasons" requirement).  The ALJ has failed to identify the record evidence that contradicts the opinion of Dr. Bales or describe how his opinion lacks support in, or is inconsistent with, the record as a whole.  *See, e.g., Friend v. Comm'r of Soc. Sec.,* 375 F. App'x 543,

552 (6th Cir. 2010) ("Put simply, it is not enough to dismiss the treating physician's opinion as incompatible with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick.").  Further, this is not a case in which the ALJ's discussion of other medical evidence and opinions in the record provides a clear basis for rejecting the treating physician's opinion.  *See, e.g.,* *Nelson v. Comm'r of Soc. Sec.,* 195 F. App'x 462, 470-71 (6th Cir. 2006) (finding that the ALJ's discussion of other medical evidence and opinions made it clear that the opinions of the claimant's treating physicians were inconsistent with the record evidence as a whole and, thus, "implicitly provided" sufficient reasons for rejecting their opinions).  Rather, the ALJ's discussion of other evidence in the record is similarly brief and conclusory.  Accordingly, the ALJ's unsatisfactory explanation for rejecting the opinion of Dr. Bales frustrates the dual purposes of the "good reasons" requirement: It neither sufficiently describes to Plaintiff the basis for the ALJ's conclusions, nor provides this Court with adequate material for meaningful review.

Furthermore, the ALJ's discussion of Dr. Bales' opinion falls short because when he rejects the opinion, he notes only that the evidence does not support Dr. Bales' finding with regard to Plaintiff's ability to sit, stand, and walk.  (Tr. 23.)  Dr. Bales does not limit his opinion, however, to Plaintiff's sitting, standing, and walking limitations.  He assesses Plaintiff's fatigue, lifting and carrying abilities, postural activities, upper exterior limitations, and environmental restrictions as well.  The ALJ does not address Dr. Bales' findings with regard to Plaintiff's fatigue; her ability to maintain attention and concentration; her ability to lift and carry; her ability to perform postural activities; her ability to reach, handle, push, and pull; and her ability to deal with heights and temperature extremes.  (Tr. 643-645.)

16

Additionally, the ALJ does not acknowledge Dr. Bales' opinion that Plaintiff would miss two or more days of work per month, and the VE testified that missing two days of work per month would preclude competitive employment.  (Tr. 59, 643.)  The ALJ's discussion of the medical evidence reads as a rote recitation of Plaintiff's longitudinal history rather than an analysis of the medical evidence and an explanation of how the evidence supports the ALJ's ultimate RFC determination.  Thus, the decision, read as a whole, does not assist the Court in understanding the ALJ's reasons for rejecting Dr. Bales' opinion.

Finally, while the Commissioner presents evidence on which the ALJ could have relied to justify giving less than controlling weight to Dr. Bales' opinion, the ALJ did not identify or discuss that evidence in his decision.  "[T]he courts may not accept appellate counsel's *post hoc* rationalizations for agency action.  It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Berryhill v. Shalala*, 4 F.3d 993, *6 (6th Cir. Sept. 16, 1993) (unpublished opinion) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 50 (1983) (citation omitted)).  Because the ALJ failed to adequately explain why he rejected Dr. Bales' opinion, the ALJ's decision is not supported by substantial evidence.  Plaintiff's case is remanded to the ALJ for a more careful examination of Dr. Bales' opinion.

### Dr. DeMicco

On September 25, 2013, Dr. DeMicco completed a questionnaire titled "Disorders of the Spine- 1.04A."  (Tr. 646.)  Dr. DeMicco reported that Plaintiff experienced numbness, pain in the low back and into both legs, neck pain, and numbness in the left knee area.  (Tr. 646-647.)  He further noted that Plaintiff's fibromyalgia and depression contributed to the severity of her impairment and that she could do well with pain control

17

for many weeks, but would then have a flare-up and need time off from work.  (Tr. 649.)
Dr. DeMicco also completed a pain questionnaire wherein he explained that Plaintiff had
pain that varied from moderate to severe and which interfered with Plaintiff's ability to
maintain attention and concentration to sufficiently complete tasks in a timely manner on a
variable basis ranging from occasional to constant.  (Tr. 650.)  The ALJ assigned "some
weight" to Dr. DeMicco's opinion, explaining that "[t]he medical evidence of record,
however, supports no greater than moderate limitations to concentration persistence, or
pace, including [Plaintiff's] depression."  (Tr. 24.)  Plaintiff argues that the ALJ erred in his
assessment of Dr. DeMicco's opinion, because he failed to provide "good reasons" for
assigning less than controlling weight to the opinion.

       For the same reasons as discussed above with regard to Dr. Bales' opinion, the
ALJ's discussion of Dr. DeMicco's opinion does not meet the "good reasons" requirement
of the treating physician rule.  The ALJ assigned "some weight" to Dr. DeMicco's opinion,
and specified that he rejected Dr. DeMicco's conclusion that pain would interfere with
Plaintiff's ability to maintain attention and concentration to sufficiently complete tasks in a
timely manner occasionally, frequently, or constantly, depending on Plaintiff's pain level at
a given time.  (Tr. 650.)  The ALJ's reason for rejecting this portion of Dr. DeMicco's
opinion is that it is not supported by the medical evidence of record; however, as
discussed previously, the ALJ's discussion of the record contains little analysis or
explanation.  Thus, the ALJ's blanket statement that "the medical evidence of record
supports no more than moderate limitations to concentration persistence or pace," without
more, does not provide this Court with a basis for finding that the ALJ's discussion of other
evidence in the record provides a clear basis for rejecting Dr. DeMicco's opinion.

18

Moreover, in addressing Dr. DeMicco's opinion, the ALJ did not acknowledge Dr. DeMicco's conclusion that Plaintiff may have to miss work when experiencing a flare up of pain. (Tr. 649.)  The VE testified that an individual would not be capable of sustaining competitive employment if the individual missed two or more days per month. (Tr. 59.) Thus, if the ALJ accepted Dr. DeMicco's opinion regarding Plaintiff's need for time off from work when experiencing a flare up of pain, Plaintiff would be unemployable according to the VE's testimony.   As the ALJ failed to adequately explain his reasons for assigning less than controlling weight to Dr. DeMicco's opinion, the ALJ's opinion does not supply sufficient information necessary for meaningful review.  Accordingly, Plaintiff's case is remanded to the ALJ for a more careful examination of Dr. DeMicco's opinion.

## 2.        The ALJ Erred in Posing an Incomplete Hypothetical to the VE.

Plaintiff argues that the ALJ erred in relying on VE testimony to conclude that Plaintiff could return to her past relevant work, because the ALJ did not pose a hypothetical question to the VE that accurately set forth Plaintiff's limitations.  Specifically, Plaintiff maintains that the ALJ should have included in his hypothetical to the VE, and in his RFC determination, the limitations set forth by Drs. Bales and DeMicco.  Thus, Plaintiff's second assignment of error essentially reiterates her argument that the ALJ erred in evaluating the opinions of Drs. Bales and DeMicco.  In addressing Plaintiff's first assignment of error, the Court has explained that the ALJ failed to provide good reasons for assigning less than controlling weight to the opinions of Drs. Bales and DeMicco. Accordingly, the Court is not in a position to determine whether the ALJ posed an incomplete hypothetical to the VE that did not accurately set forth Plaintiff's limitations, and, therefore, will not address Plaintiff's second assignment of error.

19

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is REVERSED and REMANDED for proceedings consistent with this Memorandum Opinion and Order.

**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: July 2, 2015

20